IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| HIEP TRUONG, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:21-cv-00015 |
| | ) | Judge Aleta A. Trauger |
| STACEY HUYNH, individually and in | ) | |
| her capacity as the Organizer and | ) | |
| Managing Member of Pavillion Nail | ) | |
| Lounge Nationwide LLC, and each of | ) | |
| its related entities and/or subsidiaries; | ) | |
| THAN "TIM" HUYNH, individually | ) | |
| and in his capacity as a Member of | ) | |
| Pavillion Nail Lounge Nationwide LLC, | ) | |
| and each of its related entities and/or | ) | |
| subsidiaries; and PAVILLION NAIL | ) | |
| LOUNGE NATIONWIDE LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM

Hiep Truong has filed a Motion for Final Default Judgment Against Pavillion[1] Nail Lounge Nationwide LLC ("Pavillion") (Doc. No. 19), to which no party has filed a response. For the reasons set out herein, the motion will be granted in part and denied in part, and the court will order an evidentiary hearing on damages.

## I. BACKGROUND[2]

Truong is a resident of Hernando, Mississippi. The individual defendants in this case, Tim

---

[1] This spelling reflects the spelling used in the company name.

[2] Unless otherwise indicated, these facts are taken from the Complaint (Doc. No. 1) and are deemed true for the purposes of all claims against Pavillion Lounge Nationwide LLC, in light of the May 25, 2021 Entry of Default against that party (Doc. No. 14).

and Stacey Huynh, live or lived in Canton, Georgia—although, as the court will discuss, physically locating the Huynhs has apparently proven to be difficult. (Doc. No. 1 ¶¶ 9–11.) Pavillion is a "holding company" owned and controlled by the Huynhs "for the purposes of building out independent limited liability companies, related entities, subsidiaries, and/or other joint ventures with" individuals with whom the Huynhs have decided to go into business. (*Id.* ¶ 13.)

In September of 2019, Truong and Stacey Huynh executed an agreement entitled "Deposit Agreement for the Purchase of 33.3% Shares of a Nail Salon Business Located at 'Town Centre' Shopping Center at Murfreesboro, TN." (Doc. No. 1-1.) The agreement identified Truong as the "Buyer" and identified his counterparty, the "Seller," as "STACEY HUYNH_PAVILLION **NAIL LOUNGE LLC**." (*Id.* at 2 (formatting in original).) Pursuant to the contract, Truong agreed "to pay One Hundred Thousand ($100,000.00) [to the Seller] as a deposit . . . toward the purchase of 33.33% shares of a nail salon business ('Business'), located at Towne Centre in the city of Murfreesboro, TN." (*Id.*) The contract required that "[t]he completion of the build-out of the Business and the furnishing of it with the required equipment and fixtures shall be done by November 1st, 2019" and provided that, if that condition was not satisfied, "then this Agreement and the Purchase Agreement are deemed to be voided and the Seller agrees to return the total Deposit to the Buyer." (*Id.*) The contract included a choice-of-law provision stating that Georgia law would apply to "[a]ny and all matters affecting the interpretation of" the contract. (*Id.*)

Truong paid the $100,000 to Stacey Huynh, who confirmed receipt. (Doc. No. 1 ¶ 17.) The build-out of the salon location, however, was not completed by November 1, 2019. (*Id.* ¶ 18.) Truong states that he "granted to Defendants, and Defendants accepted from Plaintiff, a one-time waiver to Plaintiff's right to demand a refund of the Deposit by allowing Defendants to meet their obligations to perform the build-out by the end of 2019." (*Id.* ¶ 19.) The project, however, was still

2

not completed by January of 2020, and Truong requested a refund of his deposit from Tim Huynh, who at first gave the impression that the refund would be forthcoming. (*Id.* ¶ 21.) Soon, however, the Huynhs stopped responding to Truong's messages, despite the fact that Pavillion still owed him a refund. (*Id.* ¶¶ 22–23.)

Truong continued to press the Huynhs for his money to no avail, leading Truong to hire an attorney and begin threatening litigation. After Truong escalated his efforts, Tim Huynh became somewhat responsive to text messages, but that responsiveness did not translate to Pavillion's actually returning the deposit. The Huynhs did not openly *refuse* to return the deposit or argue that Truong was not entitled to it; indeed, Mr. Huynh's texts eventually included a letter acknowledging Truong's right to the funds and promising to refund it in installments. Nevertheless, such payment never occurred, and Mr. Huynh instead continued to stall and explain that the situation was, at least in part, attributable to personal and family problems on the Huynhs' end, including Mr. Huynh's being hospitalized for COVID-19, as well as supposed logistical obstacles related to transferring the funds. (*Id.* ¶¶ 22–32.)

Finally, on January 1, 2021, Truong sued Pavillion and the Huynhs in this court. The Complaint identifies sixteen "counts," although some of the "counts" appear to refer, not to additional causes of action, but to types of damages or legal doctrines supporting recovery. Those counts are:

3

| Count | Basis | Against |
|---|---|---|
| I | Breach of contract | All defendants |
| II | Breach of fiduciary duty | All defendants |
| III | Fraud/fraud in the inducement | All defendants |
| IV | Constructive fraud | All defendants |
| V | Violation of the federal RICO statute | All defendants |
| VI | Violation of the Georgia RICO statute | All defendants |
| VII | Negligent misrepresentation | All defendants |
| VIII | Negligence | All defendants |
| IX | *Res ipsa loquitur* | All defendants |
| X | Conversion and trover | All defendants |
| XI | Breach of duty of good faith and fair dealing | All defendants |
| XII | Unjust enrichment | All defendants |
| XIII | Pre-judgment Attachment and Sequestration | All defendants |
| XIV | Attorney's fees | All defendants |
| XV | Personal liability as organizer | Stacey Huynh |
| XVI | Piercing of the corporate veil | All defendants |

(*Id.* ¶¶ 33–138.) Truong seeks various forms of declaratory and injunctive relief; general and compensatory damages of at least $100,000 plus interest; special, consequential, and punitive damages; treble damages; and costs. (*Id.* at 33–35.)

Truong was required to serve his Complaint on each of the defendants within 90 days, unless he had good cause for failing to do so. Fed. R. Civ. P. 4(m). Effecting service, however,

proved difficult—quite possibly because the Huynhs intended for it to be. On March 16, 2021, Truong filed a Declaration of Service recounting his efforts. (Doc. No. 8.) Truong explained that he hired Phoenix Legal Group LLC ("PLG") to serve the defendants, and PLG's individual process server, Frank James, attempted to do so three times at the Huynhs' most recent known address. The first two times he tried, James found the house silent with no lights on, despite the fact that there were "several" vehicles in the driveway. On his final attempt, James found the house "empty with a key box on the door" and a paper card in the mailbox, indicating that the house was vacant and was no longer receiving pickups or deliveries from the United States Postal Service ("USPS"). (*Id.* at 1–2; Doc. No. 8-1 at 3.) Further investigation revealed that the Huynhs had put the house up for sale and quickly vacated the premises, just as Truong was making good on his promise to sue them if his deposit was not returned. (Doc. No. 8 at 2–3.)

Truong recognized that he was now faced with the unenviable task of serving three defendants—a business entity and the two individuals who ran it—despite having little idea where they had gone. With regard to Pavillion itself, Truong tried two strategies. First, he attempted to effect service by mail via a number of different addresses identified from corporate filings of Pavillion and other Pavillion-affiliated businesses. Some of those letters were successfully delivered, but the one actually addressed to Pavillion's own registered agent was returned with a notice that the recipient had moved and left no forwarding address. (*Id.* at 4–5.) Truong's second strategy for serving Pavillion, however, was both simpler and less vulnerable to the defendants' own evasions. He filed a Service of Process Request with the Georgia Secretary of State, which provided a Certificate of Acknowledgment in return. (*Id.* at 6.)

The option of effecting service through the Secretary of State, however, was not available with regard to the Huynhs, who are, of course, natural persons. Truong, therefore, tried to serve

5

them at their last known address—the home at which James had failed to effect service directly. Perhaps surprisingly, he did receive return receipts—each indicating that the package was delivered "to an individual at the address at 2:00 pm on March 6, 2021 in CANTON, GA 30114." (*Id.* at 4.) The return receipts, however, do not appear to have been physically signed by either Huynh. Each receipt has a set of boxes to be checked indicating whether the item was delivered to the "addressee" or to an "agent," and each one indicates it was delivered to an agent. (Doc. Nos. 8-3, 8-4.) Each signature block contains the following language, which, as the court will discuss, does not appear to be an actual signature:



(Doc. No. 8-4 at 2; *see also* Doc. No. 8-3 at 2.)

On April 15, 2021, Truong filed a Request for Entry of Default as to all three defendants. (Doc. No. 13.) On May 25, 2021, the Clerk issued an Order granting the entry of default as to Pavillion but denying it with regard to the Huynhs on the ground that they have not yet been properly served. (Doc. No. 14.) The Clerk observed that the signature blocks on the return receipts for the Huynhs appear to reflect the following COVID-inspired USPS policy, posted on the USPS website:

> To reduce health risks, we are temporarily modifying customer signature capture procedures. While maintaining a safe, appropriate distance, employees will request the customer's first initial and last name so that the employee can enter the information on the electronic screen or hard copy items such as return receipts, and PS Forms 3811 (Domestic Return Receipt) and 3829 (Registered Dispatch Follow-Up). For increased safety, employees will politely ask the customer to step back a safe distance or close the screen door/door so that items may be left in the mail receptacle or appropriate location by the customer door.

(*Id.* at 3.) The Clerk concluded that a mailing delivered and acknowledged pursuant to that policy

6

is not sufficient to satisfy the personal signature requirement of Tenn. R. Civ. P. 4.04(10), as applied to cases in this court pursuant to Fed. R. Civ. P. 4(e)(1). (*Id.* at 4.)

On August 6, 2021, Truong filed a Motion for Final Default Judgment directed only at Pavillion. (Doc. No. 19.) Truong requests a broad range of declaratory and injunctive remedies, including a declaration that "the corporate veil of Pavillion and each of its Related Entities be pierced and the entities disregarded, holding its organizers and members personally liable for the acts of Pavillion and each of the Related Entities." (Doc. No. 19 at 3.) Truong seeks a number of restrictions on Pavillion's activities, as well as "the suspension or revocation of any business licenses, permits, or prior approvals granted to Pavillion by any agency" and "the forfeiture of all organizations with which Pavillion conducts business," despite the fact that those remedies would require the court to dictate the behavior of nonparties, including, potentially, government agencies. (*Id.* at 4.) With regard to money damages, Truong argues that the court should not only grant him his $100,000 deposit back plus interest, costs and attorney's fees, but should impose treble damages and order punitive, special, and consequential damages. (*Id.* at 3–4.) Altogether, the full money damages requested by Truong amount to over $4.5 million. (Doc. No. 19-5 at 9.) Truong has not sought any reconsideration of the Clerk's decision not to enter default as to the Huynhs.

## II. LEGAL STANDARD

After a party's default has been entered under Rule 55(a), the court may enter default judgment. In so doing, the court treats all well-pleaded allegations of the complaint as true, except allegations regarding the amount of damages, and must determine whether those facts state a claim. *Thomas v. Miller*, 489 F.3d 293, 299 (6th Cir. 2007); *Zinganything, LLC v. Import Store*, 158 F. Supp. 3d 668, 672 (N.D. Ohio 2016). The entry of default judgment is a matter of the court's discretion, guided by factors including: (1) prejudice to the plaintiff; (2) the merits of the plaintiff's

claim; (3) the complaint's sufficiency; (4) the amount of money at stake; (5) the possibility of a dispute concerning material facts; (6) whether the default was due to excusable neglect; and (7) the strong policy favoring decisions on the merits. *Mucerino v. Newman*, No. 3:14–cv–00028, 2017 WL 387202, at *2 (M.D. Tenn. Jan. 26, 2017) (citing *Eitel v. McCool*, 782 F.2d 1470, 1472 (9th Cir. 1986); *Marshall v. Bowles*, 92 F. App'x 283, 285 (6th Cir. 2004)). If necessary, the court may conduct a hearing or make a referral to conduct an accounting, determine the amount of damages, establish the truth of any allegation by evidence, or investigate any other matter. Fed. R. Civ. P. 55(b)(2)(A)–(D).

### III. ANALYSIS

#### A. Jurisdiction

The court must determine that it has jurisdiction over an action and its parties in order to render a valid judgment, even when a defendant is in default. *Antoine v. Atlas Turner, Inc.*, 66 F.3d 105, 108 (6th Cir. 1995). The facts deemed admitted by the entry of default "include[e] jurisdictional averments." *Ford Motor Corp. v. Cross*, 441 F. Supp. 2d 837, 846 (E.D. Mich. 2006) (citation omitted).

Under 28 U.S.C. § 1332(a), this court has original jurisdiction over actions between citizens of different states "where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs." This case—about a Mississippian who thinks that two Georgians and their Georgia business absconded with $100,000 of his money—easily meets those requirements. There is similarly little doubt that, under the now-admitted facts, the court has personal jurisdiction over Pavillion, at least with regard to this case. The well-recognized doctrine of specific jurisdiction "grants jurisdiction" over a claim against a defendant, regardless of whether the court possesses general jurisdiction over that defendant, "to the extent that a claim arises out of or relates to a

8

defendant's contacts in the forum state." *Miller v. AXA Winterthur Ins. Co.*, 694 F.3d 675, 678–79 (6th Cir. 2012) (citing *Kerry Steel, Inc. v. Paragon Indus., Inc.*, 106 F.3d 147, 149 (6th Cir. 1997)). Pavillion entered into an agreement to build a nail salon in this district, and it failed to do so, giving rise to the damages at issue in this case. The court therefore has specific personal jurisdiction with regard to claims for those damages.

**B. Entitlement to Default Judgment**

"Once the default is established, defendant has no further standing to contest the factual allegations of plaintiff's claim for relief. . . . [H]owever, it remains for the court to consider whether the unchallenged facts constitute a legitimate cause of action, since a party in default does not admit conclusions of law." Wright & Miller, 10A Fed. Prac. & Proc. Civ. § 2688.1 (4th ed.). Although the underlying conflict in this case is, in many ways, quite straightforward, Truong has pleaded sixteen total ostensible causes of action. The court, accordingly, must consider which, if any, of those causes of action is supported by the facts.[3]

    1. Counts Stating Sufficient Common Law Claims (I, II, III, IV, VII, X, XI)

Count I is for breach of contract, the cause of action that most obviously applies to the underlying facts. "The elements for a breach of contract claim in Georgia are the (1) breach and the (2) resultant damages (3) to the party who has the right to complain about the contract being broken." *SAWS at Seven Hills, LLC v. Forestar Realty, Inc.*, 805 S.E.2d 270, 274 (Ga. Ct. App. 2017) (quoting *Dewrell Sacks, LLP v. Chicago Title Ins. Co.*, 749 S.E.2d 802 (Ga. Ct. App. 2013)).

---

[3] As the court has noted, the contract at issue in this case had a choice of law provision designating Georgia law as applicable to any disputes involving the contract's interpretation. Some of the causes of action at issue here, however, involve more than merely contractual duties, and it is possible that a more complex choice of law analysis would apply to those claims. Nevertheless, the court will apply Georgia law because (1) Pavillion, by failing to appear, has not disputed the applicability of that law and (2) the court is not aware of any determinative differences between Georgia law and the law of the other relevant states with regard to the relevant aspects of the underlying causes of action.

9

The facts of this case present a textbook case of such a claim. Pavillion entered into a contract that gave it an obligation to refund Truong's deposit if it failed to complete certain actions by a particular date, it did fail to complete those actions by the date that was extended by agreement, and it failed to pay the refund. Because the contract was breached and Truong was harmed, he is entitled to default judgment on Count I.

Count II is a claim for breach of fiduciary duty. "A claim for breach of fiduciary duty requires proof of three elements: (1) the existence of a fiduciary duty; (2) breach of that duty; and (3) damage proximately caused by the breach." *Ray v. Hadaway*, 811 S.E.2d 80, 84 (Ga. Ct. App. 2018) (citations omitted). Under Georgia law, participants in a common enterprise who enter into a contractual relationship governing that enterprise can be subject to fiduciary duties to each other. *See Wimpy v. Martin*, 846 S.E.2d 230, 234 (2020).

The Complaint identifies three alleged breaches by the defendants:

(a) they failed to complete the build-out according to the Completion Date;

(b) they failed to complete the build-out by the Amended Completion Date; and

(c) they failed to refund the Deposit to Plaintiff.

(Doc. No. 1 ¶ 41.) Each of those duties, on its face, was simply a straightforward *contractual* duty, not necessarily a duty arising out of the fiduciary relationship itself. Nevertheless, because all the allegations of the Complaint are deemed admitted due to Pavillion's default, the court must accept not only that the defendants failed to complete the build-out, but that, as the court will discuss with regard to Truong's fraud allegations, the defendants *knew* that they would fail and simply wasted Truong's time and money. Those additional instances of bad faith, as admitted, would support a claim for breach of fiduciary duty, and Truong is therefore entitled to default judgment on such a theory.

Count III is a claim for fraud. In Georgia, "[t]he tort of fraud has five elements: (1) a false representation by the defendant; (2) scienter; (3) an intent to induce the claimant to act or refrain from acting; (4) justifiable reliance by the claimant; and (5) damage to the claimant." *Rubenstein v. Palatchi*, 857 S.E.2d 81, 87 (Ga. Ct. App. 2021) (citing *Ades v. Werther*, 567 S.E.2d 340 (Ga. Ct. App. 2002)). In the Complaint, Truong lists a number of falsehoods that, he alleges, the defendants knowingly made and on which he relied, for example, in paying the deposit and/or delaying his efforts to recoup the deposit:

(a) that Defendants intended to actually engage in the joint venture with Plaintiff;
(b) that Defendants intended to and were capable of performing their obligations according to the Contract;
(c) that Defendants intended to and were capable of completing the build-out by the Completion Date;
(d) that Defendants intended to and were capable of completing the build-out [by] the Amended Completion Date;
(e) [that] Defendants['] delay of the return of the Deposit [was] due to the Excuses communicated through text message;
(f) [that] Defendants had to delay the return of the Deposit due to needing to get "the document from the attorney" in order to "move forward"; and
(g) [that,] upon Defendants' failure to so complete the build-out, Defendants intended to return the Deposit.

(Doc. No. 1 ¶ 45.) Although it may be debatable whether every one of these statements is individually sufficient to support a fraud claim, the court finds that, in light of Pavillion's default, Truong has established that Pavillion committed fraud in both inducing Truong's decision to go into business with the defendants and to delay in seeking his money more aggressively. The court therefore will grant default judgment as to Count III. For the same reasons, Truong is entitled to default judgment on Counts IV and VII, which cover the less demanding, but otherwise similar, torts of constructive fraud and negligent misrepresentation. *See Lafontaine v. Alexander*, 808 S.E.2d 50, 55 (Ga. Ct. App. 2017) (stating elements of negligent misrepresentation); *Laws. Title*

*Ins. Corp. v. New Freedom Mortg. Corp.*, 645 S.E.2d 536, 540 (Ga. Ct. App. 2007) (comparing fraud and constructive fraud).

Count X is for conversion and trover. "[G]enerally, money is not subject to a civil action for conversion." *Taylor v. Powertel, Inc.*, 551 S.E.2d 765, 769 (Ga. Ct. App. 2001) (citing *Branch v. Alliance Syndicate*, 469 S.E.2d 807 (Ga. Ct. App. 1996)). However, "[t]here exists an exception" for money that "comprise[s] a specific, separate, identifiable fund." *Id.* (citations omitted). As pleaded, the $100,000 deposit fits that exception, because it constituted a discrete amount of money held for a specific purpose with the expectation that it could be recovered if certain events came to pass. Truong, moreover, has adequately pleaded the elements of conversion, which, under Georgia law, "consists of an unauthorized assumption and exercise of the right of ownership over personal property belonging to another, in hostility to his rights; an act of dominion over the personal property of another inconsistent with his rights; or an unauthorized appropriation." *Decatur Auto Ctr. v. Wachovia Bank, N.A.*, 583 S.E.2d 6, 7 (Ga. 2003) (citation omitted). When the build-out was not completed on time, the deposit funds became Truong's to demand, and he demanded them, but Pavillion simply kept those funds for itself. Truong is therefore entitled to default judgment on Count X.

Count XI is for breach of the duty of good faith and fair dealing. Under Georgia law, the duty of good faith and fair dealing is not an independent duty, but rather a covenant that is read into each contract and which "cannot be breached apart from the contract provisions" at issue. *Oconee Fed. Sav. & Loan Ass'n v. Brown*, 831 S.E.2d 222, 231 (Ga. Ct. App. 2019). As a practical matter, then, the implied covenant of good faith and fair dealing typically only comes into play when the defendant party arguably complied with the technical terms of the contract but did so in a bad faith manner. Because the conceded facts show that Pavillion violated the express terms of

the contract, this cause of action is arguably surplusage. Nevertheless, in light of the admitted facts regarding the defendants' intent, knowledge, and bad faith, the cause of action is supported, and the court will grant default judgment as to Count XI.

### 2. Counts that Are Not Independent Causes of Action (IX, XIII, XIV, XV, & XVI)

Several of the ostensible counts pleaded by Truong are, on closer inspection, not actually independent causes of action, but rather assertions of various legal doctrines and principles that might be applied to the other causes of action. For example, Count IX purports to be a claim for *res ipsa loquitur*, but, under Georgia law, *res ipsa loquitur* is merely a "legal maxim" stating an "evidentiar[ily] based rule which provides for an inference of negligence" if certain requirements are met. *Matthews v. Yoplait USA, Inc.*, 835 S.E.2d 393, 396 (Ga. Ct. App. 2019) (quoting *Fam. Thrift, Inc. v. Birthrong*, 785 S.E.2d 547, 551 (Ga. Ct. App. 2016); *Ken Thomas of Ga., Inc. v. Halim*, 597 S.E.2d 615, 618 (Ga. Ct. App. 2004)). Count XIV is for attorney's fees, but, as Truong's briefing appears to acknowledge, attorney's fees are only available—if at all—"as a part of the damages" for a separate claim.[4] Ga. Code Ann. § 13-6-11. (*See* Doc. No. at 15–16.) Similarly, Count XIII, for attachment and sequestration, is not a cause of action in its own right, but rather a request that the court grant Truong the benefit of certain legal mechanisms in the prosecution of his other claims. Count XVI, for piercing the corporate veil, merely involves which defendant(s) will be liable for the other causes of action and is not a cause of action itself. The court, accordingly, cannot grant default judgment as to Counts IX, XIII, XIV, and XVI. That is doubly true with regard to Count XV, which has not even been pleaded against Pavillion itself.

---

[4] The contract between the parties does not state that a party in breach will be entitled to attorney's fees, which is typically fatal to such a request in a case built around a breach of contract. Georgia, however, recognizes a limited statutory right to attorney's fees in a case where the plaintiff "has specially pleaded and has made prayer therefor and where the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense." Ga. Code Ann. § 13-6-11.

13

### 3. Insufficiently Pleaded Common Law Counts (VII, XII)

Count VIII is for negligence. The Complaint explains that this claim is premised on the assertion that the defendants "breached their duty of care by failing to complete the build-out of the nail salon business as they had done on multiple previous occasions." (Doc. No. 1 ¶ 84.) The Complaint does not, however, provide any sufficient factual basis to conclude that the defendants' failure to complete the project was the result of any particular general negligence as opposed to, for example, ordinary construction difficulties, cash shortages, or, for that matter, conscious malice on behalf of the defendants, which, though actionable, would not fit well into the general negligence framework.[5] The Complaint, in short, simply does not describe negligence as the source of the underlying injuries (other than, at the most, with regard to negligent misrepresentation). The court therefore will not grant default judgment in Truong's favor as to Count VIII.

Count XII is a claim for unjust enrichment, a doctrine that, like the implied duty of good faith and fair dealing, is most often used when the traditional elements of breach of an express, binding contractual obligation cannot be established. However, unlike with regard to the duty of good faith and fair dealing, a claim for unjust enrichment is only available "if there is no legal contract" governing the dispute at issue. *Campbell v. Ailion*, 790 S.E.2d 68, 73 (Ga. Ct. App. 2016) (quoting *Jones v. White*, 717 S.E.2d 322 (Ga. Ct. App. 2011)). While Truong may have been acting prudently by pleading this alternative count, Pavillion has now, as a matter of law, conceded the facts establishing the existence and application of the contract, rendering unjust enrichment unavailable as a claim. The court accordingly will not grant default judgment as to Count XII.

### 5. Federal and Georgia RICO Counts (V, VI)

Count V is a claim under the civil provisions of the Racketeer Influenced and Corrupt

---

[5] Such malice would, however, be reached by claims for fraud or conversion, and the court is, in fact, granting default judgment as to those claims.

Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.*, and Count VI is under that act's Georgia counterpart, Ga. Code Ann. § 16-14-2 *et seq*. RICO provides that it shall be unlawful for any person employed by or associated with any enterprise engaged in interstate or foreign commerce to conduct or participate in the conduct of such enterprise's affairs through a pattern of racketeering activity. 18 U.S.C. § 1962(c). To state a claim under this statute, a plaintiff must plead (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Orlowski v. Bates*, 146 F. Supp. 3d 908, 928 (W.D. Tenn. 2015). A plaintiff must prove the existence of (1) an ongoing organization with some sort of framework or superstructure for making and carrying out decisions; (2) that the members of the enterprise functioned as a continuing unit with established duties; and (3) that the enterprise was separate and distinct from the pattern of racketeering activity in which it engaged. *W. & So. Life Ins. Co. v. JPMorgan Chase Bank*, 54 F.Supp.3d 888, 917–18 (S.D. Ohio 2014).

The enterprise itself is not liable for RICO violations; rather, the "persons" who conduct the affairs of the enterprise through a pattern of racketeering activity are liable. *Id.* A plaintiff therefore must allege the existence of two distinct entities: a "person" and an "enterprise." *In re ClassicStar Mare Lease Litigation*, 727 F.3d 473, 490 (6th Cir. 2013); *see also The Adams Group, Inc. of Middle Tenn. v. Tunnell*, 2014 WL 2781128 at * 6 (M.D. Tenn. June 19, 2014). "[A] corporation cannot be both the 'enterprise' and the 'person' conducting or participating in the affairs of that enterprise." *In re ClassicStar*, 727 F.3d at 490 (quoting *Begala v. PNC Bank, Ohio, Nat. Ass'n*, 214 F.3d 776, 781 (6th Cir. 2000)). The Complaint expressly states that Truong intends for Pavillion itself to be the "enterprise" for the purposes of his RICO claims. (Doc. No. 1 ¶ 60.) That may well be a viable approach against the Huynhs, but it precludes a judgment against Pavillion itself under RICO. In his briefing, Truong identifies no reason to suspect that a different

analysis would apply with regard to Georgia RICO. The court therefore will not grant him default judgment as to Counts V and VI.

### C. Effect of Default Judgment on Individual Defendants

Truong concedes that default has not been entered against the Huynhs and that he is therefore not presently entitled to default judgment against them. Nevertheless, he argues that the court is free, at this stage, to enter a judgment stating that the Huynhs are liable *through* Pavillion due to piercing of the corporate veil and/or organizer liability. Truong, however, offers little to support such a seemingly contradictory approach. If a plaintiff could simply use a default judgment against a corporate entity to obtain liability against individual defendants who were never served, it would negate the requirement of personal service to the individual defendants in the first place. A claim against Tim or Stacey Huynh is a claim against Tim or Stacey Huynh, regardless of whether it must pass through Pavillion to reach them. Default has not been entered against either of the Huynhs, meaning that they, as parties, cannot be the subject of a default judgment *on any grounds*.

The court's judgment, therefore, will be directed at Pavillion alone and will not include any finding that either Huynh is liable through piercing of the corporate veil or any other mechanism. That does not mean that the Huynhs will not ultimately be on the hook for the damages; as the court will discuss, there is an existing structure for the collection of judgments, and the court cannot predict, at this stage, how that structure will end up being used in this conflict. The claims against the Huynhs, moreover, remain pending. For now, however, there is no basis for directly imposing liability on Tim or Stacey Huynh.

### D. Money Damages

On the facts alleged, there is little doubt that Truong is, at a minimum, entitled to a default

judgment in the amount of $100,000 plus interest calculated from January 1, 2020. As with the question of liability, however, the court's inquiry is complicated by Truong's decision to pursue an unusually high number of alternative routes for resolving this relatively straightforward conflict. With regard to money damages, that means addressing whether Truong is entitled to treble damages, special damages, consequential damages, punitive damages, and/or attorney's fees. Some of those options may be off the table because Truong has failed to succeed as to all of his claims. Others, though—including punitive damages and statutory attorney's fees under Ga. Code Ann. § 13-6-11—may still be available but present factual issues that must be resolved before damages of that type, if any, can be awarded.[6]

Where damages in a default judgment case depend on particular factual issues, rather than flowing inescapably from a finding of liability, those facts typically "must be proven in a supplemental hearing or proceeding." *Rice v. Mark IV Auto.*, No. 01-1255, 2002 WL 1397252, at *1 (W.D. Tenn. June 11, 2002) (quoting *Everyday Learning Corp. v. Larson*, 242 F.3d 815, 818 (8th Cir. 2001)). The court, however, has serious concerns about whether such a hearing would be worthwhile at this stage. Pavillion, by Truong's own account, appears to be an essentially defunct entity, and Truong has made no secret of the fact that he hopes to be able to recover from the Huynhs directly. Moreover, the claims against the Huynhs are still pending and might even be quickly resolved if Truong can accomplish adequate service and the Huynhs fail to respond—as it seems at least relatively likely would be the case. The interests of justice and efficiency appear to

---

[6] Although "[p]unitive damages are not applicable to a claim for breach of contract[,] . . . they may be awarded for fraud," which is a tort. *Smithson v. Parker*, 528 S.E.2d 886, 889 (2000). Under Georgia law, "punitive damages are awardable in tort actions in which the plaintiff proves by clear and convincing evidence that the defendant's actions demonstrated 'willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences.'" *Smithson v. Parker*, 528 S.E.2d 886, 889 (2000) (quoting Ga. Code Ann. § 51–12–5.1(b)); *see also* Ga. Code Ann. § 13-6-11 (permitting recovery of attorney's fees against a party that "has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense").

17

strongly support a resolution of the liability of all of the defendants simultaneously, if that is at all possible. The court, accordingly, strongly urges Truong to continue to pursue some form of effective service against the Huynhs, and the court will continue the holding of an evidentiary hearing on damages until a future date in which all three defendants can be addressed and/or it is clearly established that that will not be feasible. If and when Truong would like such a hearing to proceed, he may file a motion requesting an end to the continuance, which the court will consider at that time.[7]

### E. Non-Monetary Relief

Truong has requested an extraordinarily broad array of additional remedies, most of which appear to be ultimately directed at ensuring—or at least increasing the likelihood—that he will successfully collect his money judgment. Truong's concerns are certainly understandable, given the difficulties he has already had with the defendants' seemingly evasive behavior. Fortunately for both Truong and the court, however, the law does not require a district court to anticipate or resolve every potential issue related to collection of a judgment at the time the judgment is entered. Quite to the contrary, the court that rendered the judgment is often not even the appropriate body for addressing those questions, because a defendant and/or its assets may be outside of that court's territorial jurisdiction. *See Condaire, Inc. v. Allied Piping, Inc.*, 286 F.3d 353, 356 (6th Cir. 2002) (discussing collection of out-of-district judgments pursuant to 28 U.S.C. § 1963). Typically, therefore, this court's practice is simply to enter the judgment, if any, to which a plaintiff is entitled on the merits, and leave any additional collection-related steps to the appropriate time and forum, if such steps prove to be necessary at all.

---

[7] The court notes, however, that, if Truong elected to drop his demand for damages against Pavillion in excess of $100,000 plus interest, then the need for a damages hearing with regard to that defendant would fall away, and the court could enter a judgment expeditiously. Truong, of course, is under no obligation to make such a concession. The court highlights it only to note that it is an option.

18

The only connection that this case and these parties have to the Middle District of Tennessee is an unfinished nail salon. As far as the court has reason to believe, the actual assets that would be used to pay a default judgment are elsewhere—possibly in Georgia—and collection efforts directed at those assets would probably be more effective in a court there, if they can even be performed from this district at all. The court hopes, of course, that Truong has no further difficulties in collecting what he is owed, wherever that money can be found. If he does have difficulty, though, he will have the option, at that time, to take full advantage of all the collection tools available to him through any and all entities that are appropriate—whether that means this court, another court, or some other agency, person, or body. The court, however, will not grant any non-monetary remedies at this time.

## IV. CONCLUSION

For the reasons set forth herein, Truong's Motion for Final Default Judgment (Doc. No. 19) will be granted in part and denied in part. Truong will be granted default judgment as to Counts I, II, III, IV, VII, X, and XI, but he will be denied default judgment as to Counts V, VI, VIII, IX, XII, XIII, XIV, XV, XVI. The court will order an evidentiary hearing on damages.

An appropriate order will enter.

.

_____
ALETA A. TRAUGER
United States District Judge

19

Case 3:21-cv-00015   Document 25   Filed 11/19/21   Page 19 of 19 PageID #: 291